UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
                                                :

UNITED STATES OF AMERICA,   :

       - v -                :      DKT: 15 CR 616 (AT)

MICHAEL PEARSE,           :

          Defendant,    :
--------------------------------------------------X

## SENTENCING MEMORANDUM OF DEFENDANT MICHAEL PEARSE

October 6, 2021

Daniel F. Lynch
Attorney at Law
20 Vesey Street, Suite 410
New York, NY 10007
(212) 571-4888
(917) 747-7164
dlynch4@gmail.com

Attorney for Defendant
Michael Pearse

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. 3
PRELIMINARY STATEMENT .......................................................................................... 4
PERSONAL HISTORY ........................................................................................................ 5
CONDITIONS AND EVENTS IN PRISON ………………………………………………7
THE GUIDELINES AND 18 U.S.C. § 3553............................................................................11

    The History and Characteristics of the Defendant (3553(a)(1) …………………………13

    The Nature and Circumstances of the Offense (3553(a)(1)……………………………..14

    The Need to Avoid Unwarranted Sentence Disparities Among Similar Defendants …..16

    The General Purposes of Sentencing Will Be Satisfied By A Sentence Below the
    Advisory Guidelines Range (3553(a)(2) .......................................................................... 19

CONCLUSION ..................................................................................................................... 20

## TABLE OF AUTHORITIES

Page(s)

Cases

Gall v. United States,
    552 U.S. 38 (2007) ...............................................................................................12

Irizarry v. United States,
    553 U.S. 708 (2013)...............................................................................................12

Pepper v. United States,
    131 S. Ct. 1229 (2011)...........................................................................................12

United States v. Cavera,
    550 F.3d 180 (2d Cir. 2008) (en banc)...................................................................12

United States v. Keller,
    539 F.3d 97 (2d Cir.2008)......................................................................................12

United States v. Pope,
    554 F.3d 240 (2d Cir.2009)....................................................................................12

United States v. Rigas,
    583 F.3d 108 (2d Cir.2009)....................................................................................11

United States v. Whitman, 12 Cr. 125 (JSR),1/24/13.....................................................13

U.S. v. Casillas, 19 Cr. 863 (VSB) (S.D.N.Y. May 4,  2020) …………………………………..11

U.S. v. Pierson, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020) ………………………………….11

U.S.s  v.  Morgan,  19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020) …………………………..11

United States v. Aracena De Jesus, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020)…….…………10


STATUTES

18 U.S.C. § 1349 …….. …………………………………………………………………………..4

18 U.S.C. 3553…........................................................................................................11-18

PRELIMINARY STATEMENT

This memorandum is respectfully submitted on behalf of defendant Michael Pearse, who is scheduled to be sentenced before this Court on October, 2021. Mr. Pearse pleaded guilty to Count One of the Third Superseding Indictment. Count One charges Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349.

Although the count to which Mr. Pearse pleaded guilty represents his participation in a large scale financial fraud case, Michael Pearse was neither the originator, the driving force, nor the leader of this scheme. Michael Pearse was the business and sales manager of an Australian software company whose programming was used by United States companies to commit a large scale fraud upon U.S. cellular phone customers. The scheme began at least a year before Mr. Pearse's participation, and continued after his exit.

Indeed, Michael Pearse has never lived a life of luxury. He is a man from a fairly modest middle class background. The monies derived from the offenses were not wasted on luxury items or lavish spending – the monies were spent on paying down a mortgage, purchasing property, keeping a business afloat, and ultimately much of the money was still in bank accounts unused, for the Government to seize. Mr. Pearse didn't drive a Mercedes, own a yacht, buy expensive jewelry, go on lavish vacations, buy vanity items or make any of the types of extravagant purchases common among financial criminals. Nevertheless, Mr. Pearse now stands before the Court having spent nearly the last three years of his life in the worst conditions known to mankind, in the one of the worst prisons in this world and under the most debilitating limitations during a worldwide pandemic. Any avarice or greed that Michael may have been exhibited has

been drained from his person under grueling conditions. Any sentence imposed in this matter will have a lasting and serious consequence to Mr. Pearse, but what he had endured thus far will last for as long as he lives.

We respectfully submit this sentencing memorandum on his behalf to ask the Court to consider Mr. Pearse's life as a whole, the entirety of who he is, and not just the conduct that he engaged in over ten years ago, conduct for which he has paid (and will continue to pay) a very steep price. We respectfully ask the Court to impose here a non-Guidelines sentence for the reasons set forth below.

I.   PERSONAL HISTORY

Michael Pearse was born on August 25, 1968 in New South Wales, Australia. He has one sibling, his sister Lisa. Michael was raised in a stable two-parent home and was educated locally in St. Patrick's College Secondary School, and at the University of Technology of Sydney, earning the Australian equivalent of a BA in accounting and finance.

Michael's early employment history dates back to his days in secondary school, as attested by a letter of recommendation from Lamson Engineering of Australia, attached as Exhibit A. His work history also includes employment with Clayton & Associates chartered accountants from 1987 through 1989. Attached as Exhibit B is letter from firm partner John Clayton attesting to Michael's intelligence, dedication, and positive disposition. Additionally, Gilbert Thomas from that firm also wrote a letter (Exhibit C) for Michael attesting to Michael's work ethic, intelligence, and integrity even more than 30 years ago.

Michael's work history continued when he joined the accounting department at NZI Life in 1989. Before NZI was sold in 1990, Michael had demonstrated such skill and character that

he was identified as "one of the company's most outstanding prospects for fast promotion". A letter from the NZI Controller KX Drummond is attached as Exhibit D.

And when not gainfully employed, Michael also found to the time to gain an appointment as a Justice of the Peace in April of 1989, and that Certificate is attached as Exhibit E. A Letter of Recommendation from his employer John Clayton was part of the Justice application and that is attached as Exhibit F.

Upon the sale of NZI, Michael moved on to Zurich Australian Insurance, where he worked for eight years. He began in the accounting department and was later elevated to the auditing department and the superannuation area. When he departed he received an excellent recommendation from the Audit Manager Bryan Port, which is attached as Exhibit G.

In 1999, Michael supplemented his education with management training and certification with the Australian Institute of Purchasing and Material Management Limited (AIPMM). A certificate of Michael's training is attached as Exhibit H.[1]

Throughout the 1990s, Michael worked for several companies in accounting and finance, spending a period in Copenhagen and in London. He returned to Sydney in 1999 and ultimately in 2005 invested in and became business and sales director for Bullroarer, the company that began its involvement in this case in 2011. Bullroarer was bought out by Hong Kong based Ozura later in 2011, and Michael worked with Ozura until 2013.

An important aspect in Michael's life in the last five years prior to his incarceration has been his role as a volunteer firefighter with the Mount Irvine Fire Brigade. Michael joined the Brigade in 2014 when he moved to the area, and completed the necessary training. His involvement has included community events, and volunteer work. Indeed, Michael had begun

---

[1] https://aipmm.com

his training for Advanced Firefighting in 2018.  A letter from Beth Raines, the Fire Captain, is attached as Exhibit I.

In 2016, Michael became involved in the Inner Origin wellness start-up as a consultant. Michael was involved in technology and software design, and customer service.  Lachlan Pope was the COO of Inner Origin and noted about Michael (Exhibit J):

> "I haven't met many people that were prepared to lead and work like Mike did, in order to keep all of the staff, customers and partners happy whilst simultaneously and proactively educating them all on the constant changes/updates."

In 2018, Michael founded a specialty foods company with Silvia Philip.  Ms. Philip describes Michael:

> "Mike's kindness, intelligence, wit, and high level of professionalism was exemplary to all those who came in contact with him."

The company was on the eve of establishing a relationship with an investor when Michael was arrested on the extradition warrant in this case.  Despite his legal difficulties and the nearly three years that Michael has been incarcerated, Ms. Philip still expresses a wish to work with Michael on this project.  Her letter is attached as Exhibit K.

Michael also worked with Adam Dobson in developing Adam's start-up business offering fair advertising for small businesses.  Adam described Michael:

> "In my 5 years working with Mike, he demonstrated to me outstanding character, he is reliable, loyal, friendly, professional, punctual, trustworthy, smart and honest."

Adam has also put his business on hold and is also willing to wait until Michael's return to Australia to begin again.  Adam's letter is attached as Exhibit L.

Tania Browitt is a clinical therapist and also personal friend of Michael's.  She has been fortunate to have Michael advise her on her business expansion and also cherishes him as a person.  Tania writes (Exhibit M):

> "Michael is one of the most generous, dependable and caring people I have ever met. His fairness, compassion and consideration for others to strive and become the best versions of themselves, shows a remarkable level of empathy and humility for humanity."

Michael has also been a mentor to his cousin James Pearse, providing guidance and support for Jim's brokerage firm for more than 15 years. James's letter is attached as Exhibit N. Michael's cousin Michelle has also written regarding the many times that Michael has shown his dedication to his larger family over the years. Michelle's email is attached as Exhibit O.

Michael has also literally been an outstanding neighbor while living in Belvoir, where he moved in 2001. Throughout the nearly 20 years living in Belvoir, Michael worked with the committee in his building, showed helpfulness and kindness to his neighbors, and exhibited an ability to mediate among its members, and helped greatly with the finances of the committee. A letter from his neighbor Len Whittaker is attached as Exhibit P, and a letter from neighbor Sharyn Rosenberg is attached as Exhibit Q.

While incarcerated in Australia, Michael achieved a certificate in cleaning operations from the BSI Learning Institute. That certificate is attached as Exhibit R.

While Michael has been incarcerated his family situation has taken a serious turn for the worse. Michael's parents are both elderly retirees and their health has declined over the last three years. Attached is a letter from Michael's parents' physician Dr. Robert Ayres, where he describes the serious mental health and physical ailments of Michael's parents, including anxiety, depression, nephropathy, cardiac issues, and mobility issues. Michael is needed at home to care for his elderly parents. Michael's only sibling his sister Lisa, has written a letter to the Court regarding this indispensability of her brother to their parents' care. This letter is attached as Exhibit S.

Michael's presence is particularly exigent given the recent terrible news regarding Lisa's partner, was been diagnosed with terminal cancer in August. As Lisa has been caring for their aging parents since Michael's incarceration in Australia on the Extradition Warrant in December of 2018, this latest tragic news will further stretch the family.  In short, Michael is desperately needed at home.  Lisa's two letters outlining these exigent circumstances are attached as Exhibit T and Exhibit U.

In the period that this case has been pending, the United States Government has seized all of the bank accounts associated with Michael's name and his companies, and in the Plea Agreement in this case, Michael also voluntarily forfeited all of the real properties in which he has ownership, including his primary residence in Belvoir.

While Michael's ownership in the Belvoir residence dates back approximately 10 years before the crimes for which Michael has pled guilty, significant of the ill-gotten monies were funneled through the mortgage and the line of credit associated with the property, so that the defense recognizes that this is an appropriate forfeiture.  That however does not negate the reality that Michael will ultimately return to Australia without a residence.

There has already been a significant and painful amount of punishment meted out in this case. Michael Pearse has lost everything in the three years of his incarceration, and when ultimately he is released from prison, he will return to Australia jobless, penniless, a convicted felon, and with no physical assets.  He will have lost years of time with his family and his loved ones, and missed crucial years in the ends of the lives of his beloved parents.  Michael's statement to the Court is attached as Exhibit V.

II.     CONDITIONS AND EVENTS IN PRISON

It is not a standard practice in counsel's preparation in a defense submission for sentencing to set forth extraordinarily difficult and often tortuous conditions of the two prisons where Michael Pearse has been housed in the 34 months that he has been incarcerated – but these are not ordinary times and Michael's incarceration has not been an ordinary prison experience.

Michael Pearse was arrested on the Extradition Warrant in December of 2018.  He was held for over two years in worst prison in Australia and one of the worst prisons in the world, Long Bay Correctional Centre.  Long Bay has been described as the "worst of the worst" and infamously as "Australia's Hardest Prison".[1]

Michael's hard time included 24 hour lockdowns, jobs as a biohazard "deep cleaner" tasked with cleaning up after suicides, cleaning feces, urine and blood from the floors and walls of the mental health unit, and cleaning and disinfecting the "aged and frail" unit.  Michael stood by helplessly as massive fires destroyed large swaths of Australia in 2018 and 2019 knowing that as a trained fireman he could have helped.

And finally, with the advent of the COVID epidemic, Michael's situation deteriorated rapidly. The lockdowns became a 24/7 experience, and the psychological devastation of pure isolation was devastating to a man who has spent his life as an admired professional among loving people.  When Michael was transported to the United States, he was in 24/7 quarantine for another two weeks, and his period in MDC-Brooklyn from January until October has been filled with lockdowns, COVID outbreaks, significant periods of isolation, and no contact from any family members and friends, all of whom are halfway across the world.

---

[2] https://catalogue.nla.gov.au/Record/7286245

Judge Engelmayer described the harsh conditions under which detainees have suffered during COVID when he imposed sentence in United States v. Aracena De Jesus, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020), ECF No. 27:

> "Finally, I am mindful . . . that you have served most of your time in prison so far during the worst pandemic in this country during the past 100 years.  I'm mindful that you may have contracted COVID-19 while in prison. I'm mindful that your experience in prison as a result of the pandemic, the preceding lockdown, the ensuing lockdown, and your own illness was frightful. Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close. My colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful  prisons overseas with more time served than measured by the calendar. The same logic applies here, and then some .... Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December."

Indeed, Since the COVID pandemic, the Judges within this District have considered the impact of the virus as a §3553(a) factor and granted downward variances based on the conditions endured by inmates at BOP facilities.  Indeed, while Michael Pearse has endured the harshness of a BOP facility, none of these other defendants also suffered through the most difficult first year of the Pandemic locked in one of the harshest prisons in the world.  See,  U.S.s  v.  Morgan, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), (sentenced to less than half of the low end of the guidelines based in part on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC prior to the current crisis); U.S. v. Casillas, 19 Cr. 863 (VSB) (S.D.N.Y. May 4,  2020),  (reducing  sentence based on conditions at MCC during the COVID-19 crisis); U.S. v. Pierson, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020), (sentenced reduced for defendant detained at MDC).

III.     THE GUIDELINES AND 18 U.S.C. § 3553

Although the United States Sentencing Guidelines (hereafter the "Guidelines") are not mandatory, sentencing judges must still "consider" them along with the factors listed in 18 U.S.C. §3553(a) (hereafter "3553(a)").  However, "[a] district court may not presume that a Guidelines sentence is reasonable, it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense.  District judges, as a result, are generally free to impose sentences outside the recommended range." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).  Moreover, the Court must consider all the sentencing factors enumerated in 3553(a) and "make an individualized assessment based on the facts presented."  Gall v. United States, 552 U.S. 38, 50 (2007); see also United States v. Rigas, 583 F.3d 108, 116 (2d Cir. 2009) ("[A] District Court must make an individualized assessment based on all of the sentencing factors in § 3553(a)").

There is a distinction between a sentence that results in a variance from the Guidelines based upon the Court's consideration of all the 3553(a) factors, and a sentence that is applied below the Guidelines as a result of certain downward departures found within the Guidelines. See, Irizarry v. United States, 553 U.S. 708, 709 (2013); see also Pepper v. United States, 131 S. Ct. 1229, 1247 (2011); United States v. Keller, 539 F.3d 97, 100 (2d Cir. 2008).  As set forth in the Plea Agreement, Mr. Pearse has a Guidelines calculation of 30, which equates to a suggested term of imprisonment of between 97 – 121  months.  However, the PSR prepared by the Department of Probation recommends a variance to 48 months. As agreed upon in the plea agreement, Mr. Pearse does not seek a downward departure from the Guidelines sentence set forth in the PSR; instead, he seeks a variance from the suggested Guidelines calculation based upon the 3553(a) factors.

A. 18 U.S.C. 3553(a)

The Second Circuit has never given specific guidance as to what weight should be given to the advisory Guidelines range or the factors enumerated under § 3553(a). It within the court's discretion to determine what is reasonable under the circumstances of each case. United States v. Pope, 554 F.3d 240, 246-247 (2d Cir. 2009) (internal quotations omitted) ("Generally, if the ultimate sentence is reasonable and the sentencing judge did not commit procedural error in imposing that sentence, we will not second guess the weight (or lack thereof) that the judge accorded to a given factor or to a specific argument made pursuant to that factor.") More simply put, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

In this case, Mr. Pearse's history and character references tell the story of an educated and hard-working man who has spent a significant amount of his life in the service of others. The defense submits that the 3553(a) factors weigh in favor of the imposition of a non-Guidelines sentence. It is worth re-stating here the seven factors set forth for the Court's consideration in 3553(a):

- the nature and circumstances of the offense and the history and characteristics of the defendant.  18 U.S.C. § 3553(a)(1);

- consideration of the general purposes of sentencing, including: "the need for the sentence imposed-- "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; "(B) to afford adequate deterrence to criminal conduct; "(C) to protect the public from further crimes of the defendant; and "(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2);

- "the kinds of sentences available," 18 U.S.C. § 3553(a)(3);

- the Sentencing Guidelines, 18 U.S.C. § 3553(a)(4);

- any relevant policy statement issued by the Sentencing Commission, 18 U.S.C.; § 3553(a)(5);

- the need to avoid unwarranted sentence disparities, 18 U.S.C.; § 3553(a)(6); and

- the need to provide restitution to any victim. 18 U.S.C.; § 3553(a)(7).

1.  *The History and Characteristics of the Defendant (3553(a)(1))*

"There is, in the common sense of it ... a huge difference between a person who is essentially a grasping, evil, crooked, despicable human being and someone who is basically a good person but has made some intentional mistakes. And the notion, [is that] if our legal system ever ceases to recognize that distinction, we will have lost our own humanity. We will be a system without justice, without mercy, without feeling for the complexity of the human experience." United States v. Whitman, 12 Cr. 125 (JSR), 1/24/13 Sentencing Tr., at 27:25 - 28:8.

Mr. Pearse has been a positivie contributor to his community for his entire life. As the attached letters indicate, he has been a volunteer firefighter, a member of his local community counsel, a mentor for family and friends, cared for his elderly parents, mentored and assisted various professional colleagues to start and grown businesses, and has been a true friend throughout his life. Mr. Pearse began working before he even left secondary school, continued working throughout his University years, and has been employed throughout his entire life. He leaves a trail of exemplary recommendations from employers dating back to the 1980s. He has spent his professional years working with and for others, advancing the lives and companies of others, and when not employed, has spent time working within his community.

It takes a special kind of individual to accept an extremely difficult job that puts their own life in danger – as a *volunteer*. Michael Pearse's five years in the local Fire Brigade were

not spent idly however. As his Chief attests, Michael worked within the community, sought further volunteers, sought more difficult tasks, and dedicated himself to training to advance in his role in the Brigade. There are very few defendants that appear before this Court with that level of community commitment.

        2.       *The Nature and Circumstances of the Offense (3553(a)(1)*

The offense is undoubtedly a serious one. While no individual victim suffered serious financial loss, the aggregate harm caused to a vast number of individuals was indeed significant. While it is clear that Mr. Pearse knowingly participated in this large financial fraud case, the scheme did not begin with him.

The architect of this auto-subscribing scheme was the lead defendant in the indictment, Darcy Wedd, who as the CEO of content aggregator firm Mobile Messenger concocted the scheme in or about 2009 with Lin Miao and Andrew Bachman, whose tech schemes go all the way back to their time as students at Babson College in 2005. Miao and Bachman formed Tatto media in 2008 and immediately began to run afoul of the law separate and apart from this case, by engaging in illegal internet practices including spamming and deceptive advertising.

Ultimately, Tatto and Mobile Messenger conspired to engage in the auto-subscribing scheme and were successful in their enterprise until the government in 2011 imposed technological restrictions that required "double opt-in" for consumers to purchase mobile content.

At a concurrent time period, the Australian software company Bullroarer had developed software that could provide short codes to subscribe mobile users to content, and that software would ultimately serve the purposes of Miao's plan. In 2011 Michael Pearse traveled to the United States as Director of Sales of Bullroarer to meet with Miao and Bachman. The CEO of

Bullroarer was Andrew Darbyshire, and along with Michael Pearse, Bullroarer agreed to migrate the mobile traffic to Bullroarer's servers and use the Tatto's short codes to subscribe users.

At or around the time of this agreement, Bullroarer was purchased by Ozura Media, and Darbyshire was pushed out, leaving only Michael Pearse and co-defendant Yong Chao ("Kevin") Liu, a software developer that Pearse retained, as a division of Ozura.

As Mr. Pearse has admitted in open court during his guilty plea, he ultimately came to understand the nature of the scheme concocted by Miao, Bachman, Wedd, and others, and that the subscribing was being done without users consent and through illegal means.  This understanding was formed through a series of emails wherein Miao set forth what he expected Pearse to do.  Michael Pearse has admitted his guilt, but what is clear from all of the circumstances in this case is that Michael did not concoct the scheme, he did not initiate the scheme, and he did not actively pursue the relationship with Tatto for illegal purposes, but rather he sought a client, then tragically passively accepted the terms and provided the software that Tatto and other used to bilk mobile subscribers.  At the point when it became clear what Tatto was proposing to do, Michael should have exited the agreement, but as he makes clear in his letter to the Court, his ultimate failure was his inability to say no to Miao.

In 2012, Ozura began to receive an escalation of refund requests and scam inquiries, and at this point Michael learned that Miao and Bachman had formed a company called "Scambook" ostensibly to weed out fake internet schemes.  However, Scambook itself was a scam, and the company was ultimately closed down by law enforcement.  The communication between Michael and Miao ended sometime in 2012, and Mr. Pearse ultimately left Ozura and returned to employment in Australia in 2013.

      3.    *The Need to Avoid Unwarranted Sentence Disparities Among Similar Defendants  (3553(a)(6)*

The Court is greatly assisted in the assessment of a proper sentence in this case by the simple fact that almost all of the defendants in the indictment have already been sentenced. The following indicates the range of sentences imposed on the other defendants based upon their roles in the scheme, and the particularities of the dispositions of their individual cases.

Darcy Wedd is both the lead defendant in the indictment and as the CEO of the prime corporate mover in this case, was the de facto "leader" of the scheme, as noted by Judge Forrest at Wedd's sentence. Wedd was tried by a jury on two occasions, and after being found guilty by a jury on December 15, 2017, he was sentenced to 120 months.

Fraser Thompson was the Senior Vice President at Mobile Messenger, and in both the indictment and in fact, was the "second" of this scheme. Thomson was also tried twice, and after conviction at the second trial, was sentenced to 60 months.

However, both Wedd and Thompson were convicted of multiple counts, including two counts of Aggravated Identity Theft that require a minimum of two years, a term which also requires mandatory consecutive sentences. As such, both Wedd and Thomson were sentenced to lesser terms on the Conspiracy counts, namely Wedd was sentenced to 48 months consecutive on the two Aggravated Identity Theft counts, consecutive to *72 months on the Fraud Counts*. Thompson having been convicted of one count of Aggravated Identity Theft, was sentenced to 24 months on that count, consecutive to *36 months on the Fraud counts*. Both of these sentences were well below the Guidelines range for each of these defendants – Wedd's Guidelines range was 120 years, and Thompson's Guidelines range was 168 to 210 months.

Francis Assifuah was an account executive at Mobile Messenger where he befriended defendants Michael Pajackowski, and Erdolo Eromo. After he departed Mobile Messenger,

Assifuah became CEO of his own content providing company Bleam Technologies, and ultimately conspired with Pajackowski and Eromo in an auto-subscribing scheme with Mobile Messenger as the aggregator for Bleam's content. Assifuah pled guilty and received a sentence of 33 months.

Christopher Goff was the Account Manager at Mobile Messenger and dealt directly with Miao in providing large batches of mobile phone numbers to Miao at the direction of Wedd. Goff used a shell corporation and concocted invoices to hide monies received from Miao. Christopher Goff pled guilty and received a sentence of 30 months in prison.

Jason Lee was a chief technical officer at Mobile Messenger, pled guilty and was sentenced to six months home confinement. Kevin Liu was the software engineer at Bullroarer/Osura and was sentenced to time served.

Goff's role was most similar to Michael Pearse, in that he was in a management capacity, not a CEO or VP like Wedd or Thompson or Assifuah (or Darbyshire at Bullroarer), and dealt directly with the technological requirements imposed by Miao. As with Goff, Michael Pearse set up companies and provided invoices to receive the monies from Miao.

If this Court were to sentence Michael Pearse in the range of Assifuah (33 months) or Goff (30 months) and afford Mr. Pearse credit for the time he served in Australia and in the United States, ultimately the Court would need to sentence Mr. Pearse to "time served".

If the Court abided by the PSR recommendation of 48 months, Michael Pearse would still be required to serve approximately 39 months in BOP custody, and he would ultimately serve in combination with his time in Australia, a sentence in excess of five years. He will have served a greater term than Fraser Thompson, a man convicted of multiple consecutive counts, convicted after two trials, and who had a far greater role in this scheme than Michael Pearse. Such a

sentence very clearly does not serve the ends of justice, and we implore this Court not to follow the recommendation of the PSR.

    4.    *The General Purposes of Sentencing Will Be Satisfied By A Sentence Below the Advisory Guidelines Range (3553(a)(2))*

Title 18 U.S.C. section 3553(a)(2)(A)-(D) instructs courts to seek the following goals through sentencing: (i) to reflect the seriousness of the offense, to promote respect for the law, and to provide justice for the offense; (ii) to afford adequate deterrence to criminal conduct; (iii) to protect the public from further crimes of the defendant; and (iv) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

The offense for which Mr. Pearse has pleaded guilty is indeed a serious one. He clearly acknowledged his guilt to this Court. He has remorse and genuine regret for his conduct as well. The hardship that this conviction has caused and will forever cause Mr. Pearse cannot be understated. The damage he has inflicted on his family and the disintegration of the life he led can not be underestimated. The traditional purposes of punishment, deterrence, and restitution have clearly already been satisfied. There is no just reason to impose any further term of imprisonment on this defendant, who admits that this three-year period of intense and often brutal incarceration has "broken me".

## CONCLUSION

The defense asks the Court to consider, in light of the exemplary life Mr. Pearse has lived, his current financial and familial circumstances, and the emotional and psychological pain

he has already suffered as a result of the conviction in this case, that the Court impose a non-Guidelines sentence. Specifically, we ask the Court to consider imposing a sentence time served with an immediate order of deportation. Mr. Pearse has already served very nearly three years of the hardest time imaginable in the worst conditions any defendant in recent memory has had to endure.

    The sentence requested by the defense is sufficient to meet all of the criteria for a sentence in any criminal case, and in this case in particular satisfies the aspects of punishment, rehabilitation, and deterrence. The years that Mr. Pearse has been away from his family and the fact that he'll return to his home country with no employment, no home, and not a dollar to his name will serve as an adequate sentence in all regards.

                                                                                 Respectfully Submitted,

                                                                                 June 29, 2021

                                                                                 Daniel F. Lynch  
                                                                                 Attorney at Law  
                                                                                 20 Vesey Street, Suite 410  
                                                                                 New York, NY  10007  
                                                                                 (212) 571-4888  
                                                                                 (917) 747-7164  
                                                                                 dlynch4@gmail.com

                                                                                Attorney for Defendant  
                                                                                 Michael Pearse