

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 13, 2021

**BY ECF**

The Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Michael Pearse*, S3 15 Cr. 616 (AT)

Dear Judge Torres:

      The Government respectfully submits this letter in advance of the sentencing of defendant Michael Pearse ("Pearse" or the "defendant") on October 20, 2021. As set forth in the Presentence Investigation Report ("PSR"), the Guidelines range is 97 to 121 months' imprisonment. The Probation Office recommends a sentence of 48 months' imprisonment, while the defendant requests a sentence of time served.

      The defendant played an extensive and important role in a massive fraud that stole money from hundreds of thousands of Americans by "auto-subscribing" them to unwanted and unsolicited text messages without their knowledge or consent. As Chief Executive Officer ("CEO") of a company that created, deployed, and perfected the computer program used to fraudulently auto-subscribe victims, the defendant participated in key decisions to ensure that the criminal scheme could continue to operate without detection. For his critical role in the scheme, the defendant personally pocketed more than $10 million in fraud proceeds—a fact that sets him apart from most of his co-defendants. The Government respectfully submits that, given the seriousness and aggravated nature of the defendant's offense conduct, a sentence within the Guidelines range of 97 to 121 months would be sufficient, but not greater than necessary, to meet the goals of sentencing in this case.

**A.**      **Background**

      **1.**      **The Offense Conduct**

      From 2011 to 2013, Pearse and others engaged in a multimillion-dollar scheme to defraud mobile phone consumers by placing unauthorized charges for premium text messaging services on the consumers' cellular phone bills through a practice known as "auto-subscribing." (PSR ¶ 29). To carry out the scheme, Pearse and others caused unsolicited and recurring text messages to be sent to mobile phone users containing content such as horoscopes, celebrity gossip, or trivia facts. The victims of the fraud scheme never ordered these services, which were known in the industry

as premium text messaging ("Premium SMS" or "PSMS") services, but were fraudulently auto-subscribed and billed for them at a rate of $9.99 per month. The $9.99 charge recurred each month unless and until consumers noticed the charges and took action to unsubscribe. Even then, consumers' attempts to dispute the charges and obtain refunds were often unsuccessful.

The auto-subscription scheme involved two main players in the mobile phone industry: content providers and aggregators. Content providers offered the Premium SMS services, each of which was assigned a five- or six-digit number called a "short code." Aggregators served as the middlemen between the content providers and the mobile phone carriers, and facilitated placing charges for the PSMS services on the consumers' cellphone bills.

To prevent fraud, it was standard industry practice in the Premium SMS industry to require that consumers take two steps to confirm a purchase of a Premium SMS service. (PSR ¶ 34). This practice was known as "double opt-in" verification. (*Id.*). For example, a content provider typically advertised to consumers over the Internet. (*Id.*). The consumer, in response to the Internet advertisement, entered his or her phone number on the website (the first opt-in), and then received a text message describing how to sign up for the subscription service. (*Id.*). Typically, the consumer then had to return to the website and enter a PIN number, which was contained in the text message the consumer received, onto the website (the second opt-in). (*Id.*). Once the consumer had opted-in through the double opt-in process, the consumer was enrolled in the content provider's Premium SMS service, and the charges would begin to appear on the consumer's mobile phone bill. (*Id.*). As part of the auto-subscription scheme, however, and as further described below, Pearse and his subordinate Yongchao Liu, a/k/a "Kevin Liu" ("Kevin Liu") developed computer software to "spoof" the double opt-in verification—that is, to fraudulently make it appear that consumers had signed up for Premium SMS services, when in fact they had not. This software was instrumental to the ability of Pearse and his co-conspirators to successfully perpetrate the massive and long-running fraud scheme charged in this case.

<u>Auto-Subscribing by Tatto</u>

Pearse's chief co-conspirator in the scheme was a cooperating witness named Lin Miao ("Miao"). Miao was the CEO of a digital content provider known as Tatto Inc., a/k/a "Tatto Media" ("Tatto"). (PSR ¶ 40). Tatto was a U.S.-based content provider that offered Premium SMS services to mobile phone customers. (*Id.*). In or about 2011, Miao decided to begin auto-subscribing mobile phone users to the Premium SMS services of Tatto to boost Tatto's sagging revenues.[1] (PSR ¶ 43).

To do this, Miao needed a way to make it appear that the consumers who were auto-subscribed had actually agreed to be billed for the Premium SMS service, in the event that a mobile carrier or one of the industry compliance groups conducted an audit of the short code subscriptions. (PSR ¶ 43). To falsify the necessary digital trail such an audit would require, Miao approached

---

[1] On or about May 28, 2015, Miao was arrested for his role in the auto-subscribing scheme. Following Miao's arrest, Miao began cooperating with the Government. Miao has entered a guilty plea pursuant to a cooperation agreement with the Government and has not been sentenced yet (15 Cr. 628 (AT)).

Pearse, who owned a digital content provider and mobile aggregator named Bullroarer, based in Australia. (*Id.*). At that time, Pearse was the CEO and Liu was a Java Development Engineer for Bullroarer. (PSR ¶ 39). Liu reported to Pearse. Miao asked if Bullroarer could build a computer program that could "spoof" the required consumer authorizations—*i.e.*, a program that could generate the text message correspondence that one would ordinarily see with genuine double opt-in verifications. (PSR ¶ 43). Pearse and Liu, at Pearse's direction, built the program (the "Auto-Subscription Platform"), which was operational by in or about the middle of 2011. (*Id.*).

During the summer of 2011, as reflected in, among other things, internal emails retrieved from a computer server used by Tatto (the "Tatto Server"), Miao, Pearse, and Liu obtained and ran hundreds of thousands of phone numbers, which had been provided to them by other co-conspirators, through the Auto-Subscription Platform. (PSR ¶¶ 44-45). They then billed the subscriptions through mobile aggregators, including a mobile aggregator based in the United States, known as Mobile Messenger. (PSR ¶ 45). In September 2011, executives at Mobile Messenger—including its chief operating officer ("COO") Darcy Wedd ("Wedd")—noticed that the data for one Tatto's short code campaigns indicated non-compliance and raised the issue with Miao, as well as with Andrew Bachman ("Bachman"), who was the Director of Global Sales for Tatto.[2] (*Id.*).

In October 2011, Miao met with Wedd in San Diego, California. (PSR ¶ 46). During this meeting, Miao told Wedd that Miao wanted to auto-subscribe consumers through Mobile Messenger, and he needed Wedd's help to do so. (*Id.*). Miao further told Wedd that he wanted additional mobile phone numbers and short codes to facilitate the auto-subscribing scheme. (*Id.*). Wedd agreed to assist Miao in exchange for an up-front payment of approximately $100,000 and a percentage of the auto-subscription proceeds. (*Id.*). Wedd also told Miao that Michael Pajaczkowski, who was Mobile Messenger's vice president of compliance and consumer protection, would provide mobile phone numbers to Miao and that all payments needed to go through Pajaczkowski. (*Id.*). Wedd later received his portion of the payments from Miao, via Pajaczkowski. (*Id.*).[3]

Shortly after the meeting with Wedd in San Diego, in October 2011, Miao directed Bachman to meet with Pajaczkowski at Mobile Messenger's headquarters in Los Angeles. (PSR ¶ 47). At that meeting, Bachman gave Pajaczkowski a portion of the $100,000 up-front payment (approximately $34,000 in cash), and in return Pajaczkowski gave Bachman a thumb drive containing, among other things, a large number of additional mobile phone numbers to be used to auto-subscribe consumers through Mobile Messenger. (*See id.*). Pajaczkowski provided additional batches of phone numbers to Miao and Bachman on several occasions up through mid-

---

[2] In or around February of 2015, Bachman began cooperating with the Government, prior to being arrested for his role in the auto-subscribing scheme. Bachman has entered a guilty plea pursuant to a cooperation agreement with the Government and has been sentenced (15 Cr. 253 (JMF)).

[3] On or about May 28, 2015, Pajaczkowski was arrested for his role in the auto-subscribing scheme. Following Pajaczkowski's arrest, Pajaczkowski began cooperating with the Government. Pajaczkowski has entered a guilty plea pursuant to a cooperation agreement with the Government and has not been sentenced yet (15 Cr. 606 (AT)).

2012.  (*Id.*).  After the phone numbers were screened by another co-conspirator, Miao sent the numbers to Pearse and Liu to be run through the Auto-Subscription Platform.  (PSR ¶ 48).

Tatto auto-subscribed hundreds of thousands of phone numbers through Mobile Messenger, generating millions of dollars in revenue through mid-2013.  (PSR ¶ 49).  In an effort to protect the revenue generated by the auto-subscription scheme, Pearse and other co-conspirators took steps to conceal the scheme from the mobile carriers and mobile industry compliance groups.  Among other things, Pearse directed Liu to modify the Auto-Subscription Platform to randomize the timing of the text messages that it generated—which were supposed to appear as if they were generated by actual consumers opting-in to the Premium SMS service—in a way that made them appear human-driven, not computer-driven.  (*Id.*).  The goal was to make the subscriptions appear natural to avoid short code audits entirely or to minimize their severity.  (*Id.*).

Pearse also took steps to conceal his own involvement in the fraud scheme.  For example, Miao wired Pearse's share of the auto-subscribing proceeds to several nominee companies controlled by Pearse that were located in the United States, Hong Kong, and Australia, among other places.  (PSR ¶ 53).  Pearse knew well that the money he was receiving from Miao consisted of proceeds from the illegal auto-subscribing activity, as evidenced by emails between Pearse and Miao.  To conceal the purpose of these payments, Pearse sent false invoices from his nominee companies to Tatto requesting payment for services rendered that, in fact, had never been provided.  (*Id.*).

In total, Miao received about $50 million in proceeds from the fraudulent scheme to auto-subscribe with Tatto, using the Auto-Subscription Platform built and customized by Pearse and Liu.  Miao, in turn, distributed over $10 million in criminal proceeds from scheme to Pearse for Pearse's role.  (PSR ¶ 80).  Liu received a modest salary from Bullroarer of approximately $44,000; he did not receive any proceeds in exchange for his involvement.

Pearse was arrested in Australia pursuant to the Government's red notice on or about December 19, 2018, and extradition proceedings ensued.  Pearse contested extradition and was detained in Australia pending the conclusion of the extradition proceedings.  The Australian government ultimately issued a surrender warrant for Pearse, and he was extradited to the United States on January 25, 2021.  Pearse has been detained since his arrival in the United States.

### 2. The Charges, the Plea Agreement, and the Guidelines Calculation

On June 8, 2021, Pearse pleaded guilty, pursuant to a plea agreement with the Government, to Count One of the Superseding Indictment, S3 15 Cr 616 (AT), which charged him with participating in a conspiracy to commit wire fraud by auto-subscribing consumers.

The plea agreement sets forth the following calculation of the offense level under the United States Sentencing Guidelines:

(1) A base offense level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1);
(2) A 22-level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(L), because the loss amount was more than $25,000,000 but less than $65,000,000;

(3) A two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense involved 10 or more victims;

(4) A two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(10), because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, and/or a substantial amount of the fraudulent scheme was committed from outside the United States; and

(5) A three-level decrease, pursuant to U.S.S.G. § 3E1.1(a) and (b), for acceptance of responsibility.

In accordance with the foregoing, the applicable Guidelines offense level is 30. The parties agree that Pearse has no prior convictions and, therefore, his Criminal History Category is I, yielding a Guidelines range of 97 to 121 months' imprisonment. (PSR ¶ 14). The PSR contains the same Guidelines calculation as that set forth in the plea agreement. (PSR ¶¶ 89-104, 153).

As part of his plea agreement, Pearse is required to forfeit $10,162,937.96 in U.S. currency, as well as his interest in three real properties in Australia and other assets, representing proceeds traceable to the fraud that Pearse personally obtained as part of the fraud scheme. The Court previously entered a consent preliminary order of forfeiture against Pearse. (Dkt. No. 836).

**B.   Discussion**

  **1.   Applicable Law**

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (2) the four legitimate purposes of sentencing, as set forth below, *see id.* § 3553(a)(2); (3) "the kinds of sentences available," *id.* § 3553(a)(3); (4) the Guidelines range itself, *see id.* § 3553(a)(4); (5) any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); (6) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (7) "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the that extent a district court imposes a sentence outside the range recommended by the Guidelines, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50) (internal quotation marks omitted).

> 2. **A Sentence Within the Guidelines Range of 97 to 121 Months' Imprisonment Would Be Just and Appropriate**

The Government respectfully submits that a sentence within the Guidelines range of 97 to 121 months' imprisonment would be fair and appropriate in this case. In particular, the nature and circumstances of the offense, the need for just punishment, and the need for general deterrence all justify such a sentence.

>> a.   *Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

The defendant's offense conduct is extraordinarily serious. Pearse extensively participated in a massive, multimillion-dollar criminal scheme that defrauded hundreds of thousands of unwitting mobile phone customers of tens of millions of dollars. While Pearse was not the architect of the criminal scheme, he nonetheless played a vital role in it, committing his company's resources and employees (Liu) to build, deploy, and perfect a computer platform used to "spoof" the double opt-in verification process—a critical aspect of the scheme that allowed Pearse and his conspirators to continue defrauding consumers for two years. As the CEO of the company that built the Auto-Subscription Platform, Pearse was a key decision-maker who oversaw and directed a central aspect of the criminal scheme in close collaboration with Miao.[4] While Pearse now attempts to describe his involvement as "tragically passively accept[ing] the terms" (Def. Mem. 16) and not the "driving force" of the scheme (*id.* at 4), the evidence in fact shows that, from the beginning of his relationship with Miao, Pearse was a willing, eager, and active participant in the scheme who could have stopped it at any time but did not, driven by a desire to line his own pockets. In July 2011, toward the beginning of the scheme, Miao sent an email to Pearse and Bachman outlining a plan on how they could "each make $2 Million USD before end of the year." (Exh. A). Pearse agreed with the plan and committed to taking action, responding, in part: "We will have a platform Auto-Load Console for you to use late next week, to make the ramp-up of traffic easier. . . . Lets stay tight & I know we will come through this even stronger ….. and wealthier !!" (*Id.*). In November 2011, Pearse and Miao met in Singapore in November 2011 to discuss the scheme. They then strategized on how to run auto-subscriptions on multiple platforms, not just through Mobile Messenger. Pearse doled out various tasks surrounding the Auto-Subscription Platform to Kevin Liu, a computer programmer who worked under Pearse and at his direction. After building the platform, Pearse and Liu used it to intentionally falsify the

---

[4] Pearse's characterization of his role at Bullroarer as a "business and sales manager" (Def. Mem. 4) is incorrect. During the period of the scheme, Pearse was Bullroarer's CEO. (PSR ¶ 39).

authorization of hundreds of thousands of U.S. consumers, knowing that they would be charged without their knowledge or consent for services they did not want and did not ask for. Put simply, this massive fraud—through which Pearse and his co-conspirators reaped tens of millions of dollars in illicit proceeds—could not have taken off, much less continued for over two years, without the defendant's willingness and ability to provide, perfect, and deploy the critical computer infrastructure needed to make the scheme succeed.

For his indispensable role in the auto-subscription scheme, Pearse personally received more than $10 million in criminal proceeds, which is a major aggravating factor in this case and, as further discussed below, sets Pearse apart from most of his co-conspirators. Pearse received and laundered his share of the fraud proceeds through several nominee companies and bank accounts in Australia, Hong Kong, and the United States. In his sentencing submission, Pearse suggests that most of his criminal proceeds have been forfeited by the Government. (*See* Def. Mem. 4 ("[U]ltimately much of the money was still in bank accounts unused, for the Government to seize."); *id.* at 9 ("In the period that this case has been pending, the United States Government has seized all of the bank accounts associated with Michael's name and his companies, and in the Plea Agreement in this case, Michael also voluntarily forfeited all of the real properties in which he has ownership, including his primary residence in Belvoir.")). Not so. While roughly half of Pearse's proceeds from the scheme were seized or restrained by the Government in connection with this investigation and a related investigation by the Federal Trade Commission ("FTC"),[5] there are still millions of dollars in proceeds that Pearse earned and laundered which the Government has not seized or restrained, despite substantial efforts.

Despite personally pocketing over $10 million in criminal proceeds, Pearse claims that he purportedly "didn't drive a Mercedes, own a yacht, buy expensive jewelry, go on lavish vacations, buy vanity items or make any of the types of extravagant purchases common among financial criminals." (Def. Mem. 4). The Court should reject this argument. To start, how Pearse chose to spend his millions in fraud proceeds cannot mitigate his serious and lucrative role in a massive consumer fraud. In any event, while Pearse may not have purchased a Mercedes or a yacht, he did spend millions of criminal proceeds on other lavish purchases and investments. For example, Pearse used approximately $315,000 in criminal proceeds to buy a second home for cash in Mount Irvine in Australia in 2013. Thus, when Pearse "moved to the area" in 2014 and became a volunteer firefighter with the Mount Irvine Fire Brigade (Def. Mem. 6), he was doing his volunteer work while living in a house purchased with cash fraud proceeds. In addition, Pearse used over $2.3 million in fraud proceeds that he received through the shell company True Merchant in Hong Kong to fund various investments and business ventures, including, among other things, to make a loan/investment of $1.19 million in a wholesale wine business in Australia; $93,000 in a private horse racing club in Australia; $264,000 in a refurbished hotel in Melbourne; and $135,000 for a share in the private development of a former prison in Melbourne. On this record, the Court should

---

[5] The FTC seized approximately $5 million in fraud proceeds, which Pearse received in a Hong Kong-based account in the name of a nominee entity called True Merchant, Ltd. ("True Merchant"). In connection with the instant case, the Government restrained a total of approximately $185,000, as well as three real properties in Australia, which Pearse funded or paid for using proceeds from the fraud (including one real property for which Pearse paid approximately $315,000 in cash using fraud proceeds).

reject Pearse's assertion that "[t]he monies derived from the offenses were not wasted on luxury items or lavish spending." (Def. Mem. 4).

Notably, there is evidence that Pease also took steps to frustrate the FTC's efforts to seize his criminal proceeds. In 2012, Pearse invested in two real estate developments in California using criminal proceeds that Pearse received through True Merchant. These investments were restrained by the FTC, which obtained a preliminary injunction. As set forth in the attached declaration filed in the FTC matter on behalf of the real estate developer, in an apparent effort to evade the FTC's injunction, Pearse falsely told the developer in 2014, in sum and substance, that the investigation of Tatto and Miao relating to the restraining order had been resolved and requested that the developer send the proceeds of his investments, totaling approximately $460,000, to accounts in Sri Lanka, which the developer did. (*See* Declaration of Jon Bloomberg ¶¶ 9-13, attached hereto as Exhibit B).

      b.     *Need for General Deterrence*

The need for general deterrence is acute in this case. Internet-based consumer frauds—particularly the type of fraud in this case, where the loss is spread across hundreds of thousands of individual victims—are particularly pernicious. These types of frauds are extremely lucrative to their perpetrators and yet inherently difficult for law enforcement to detect and stop. It has, unfortunately, become too easy for individuals like the defendant to target and victimize U.S. consumers from behind a computer screen thousands of miles away and to hide their crimes through a web of offshore shell entities and accounts. The Court's sentence of Pearse should send a strong and clear message to others that consumer frauds, particularly ones as massive and lucrative as the scheme in this case, will be met with serious consequences.

      c.     *Need to Avoid Unwarranted Sentencing Disparities*

To date, the Court sentenced six of Pearse's co-defendants for their participation in the auto-subscription conspiracy. Below is a chart summarizing the sentences received by the co-defendants:

| Name | Title/Role | Guidelines Loss Range | Apprx. Amount of Criminal Proceeds Personally Received | Sentence |
|---|---|---|---|---|
| Darcy Wedd | COO/CEO, Mobile Messenger | $65 million to $150 million | $1.7 million | 120 months |
| Fraser Thompson | Senior vice president of strategic operations, | $25 million to $65 million | $1.5 million | 60 months |

|  | Mobile Messenger |  |  |  |
|---|---|---|---|---|
| Christopher Goff | Account manager, Mobile Messenger | $3.5 million to $9.5 million | $352,800 | 30 months |
| Kevin Liu | Computer programmer, Bullroarer | $25 million to $65 million | None apart from salary (about $44,000 per year) | Time served (about 31 months) |
| Francis Assifuah | Operator of Bleam Technology, a content provider | $550,000 to $1.5 million | $350,000 (estimated) | 33 months |
| Jason Lee (misdemeanor plea) | CTO, Tatto | $65 million to $150 million | $108,000 | 6 months |

    As described above, Pearse filled a unique, central role in the criminal scheme: designing, deploying, and maintaining a software program that Pearse and his co-conspirators used to auto-subscribe hundreds of thousands of unwitting mobile phone consumers. Apart from Kevin Liu, who, as discussed below, was much less culpable than the defendant (and received none of the proceeds), none of the remaining defendants had a similar role. In an effort to aid the Court in its sentencing determination, the Government addresses the roles of the sentenced co-defendants below.

    Darcy Wedd: Wedd served as a senior executive—first the COO and then the CEO—of Mobile Messenger, the U.S.-based aggregator at the heart of the auto-subscription scheme. In the auto-subscription scheme, Mobile Messenger worked with three sets of content providers: (1) Tatto, which was operated by Miao; (2) CF Enterprises and DigiMobi, which were operated by co-defendant Eugeni Tsvetnenko, a/k/a "Zhenya," who is pending extradition from Australia, and (3) Bleam Technology, a short-lived content provider that was operated by co-defendant Francis Assifuah. Wedd was charged and convicted by a jury for his role in auto-subscribing with Tatto and with Zhenya.

Wedd's role and culpability in the scheme is difficult to compare to Pearse's. On the one hand, Wedd was the hub of the criminal conspiracy: as the CEO of Mobile Messenger, Wedd participated in auto-subscribing with several different content providers and thereby caused greater losses to a broader set of victims. In addition, while Pearse only directed Liu in the criminal scheme, Wedd had a wider network of subordinates whom he organized and led as part of the auto-subscription conspiracy. Wedd also refused to accept responsibility, proceeded to trial (thrice), and was convicted. On the other hand, Pearse pocketed significantly more in auto-subscription proceeds than did Wedd. Wedd received $190,468.49 in Tatto auto-subscribing proceeds, as well as $1,552,114.56 in Zhenya auto-subscribing proceeds, for a total of $1,742,583. Pearse, by contrast, received a total of $10,162,937.96 in Tatto auto-subscription proceeds, approximately 5.8 times more than Wedd. On balance, the Government believes that Wedd was more culpable in the scheme than Pearse, but both held active roles that were indispensable to the scheme's ability to operate and succeed.

Fraser Thompson: Thompson worked under Wedd as the senior VP of strategic operations at Mobile Messenger. Thompson was charged and convicted by a jury for his role in auto-subscribing with Zhenya, through the content providers CF Enterprises and DigiMobi. Thompson was not charged in the auto-subscription scheme with Tatto. Thompson's primary role in the Zhenya scheme was to work, together with Eromo, on the short code strategy for the scheme, to ensure that Zhenya was supplied with all the short codes he needed to be able to send the consumers the unwanted text messages. Through the Zhenya auto-subscribing scheme, Thompson received approximately $1.55 million in criminal proceeds.[6] The Government submits that Thompson was less culpable than Pearse for two primary reasons. First, while Thompson's role (provision of short codes to a content provider in the scheme) was important, it was not as instrumental as Pearse's role (the creation and deployment of the Auto-Subscription Platform). Simply put, Pearse was a more active and critical participant in the scheme, without whose continued involvement the scheme could not have started or continued. Second, tellingly, Pearse received more than 6.5 times the amount of auto-subscription proceeds than Thompson received.[7]

Christopher Goff: Goff worked for Mobile Messenger as an account manager, and his role in the scheme was to provide large batches of phone numbers (totaling hundreds of thousands of phone numbers) from Mobile Messenger's databases to Miao, in exchange for payment. Goff did this for about a year, from mid-2011 through mid-2012, and, in return, a received a total of $352,799.56 in payments from Miao. (*See* PSR ¶¶ 19, 44). While the defendant tries to analogize his role to that of Goff (Def. Mem. 18), who was sentenced to 30 months in prison, Pearse was significantly more culpable in the scheme than Goff. Unlike Pearse, Goff (a) was unaware of the

---

[6] In addition to proceeds from the auto-subscription scheme, both Wedd and Thompson also received several million dollars each in proceeds for participation in a separate, uncharged content provider scheme (which did not involve auto-subscribing).

[7] Pearse (correctly) points out that Thompson's Guidelines range was 168 to 210 months. However, the Government notes that Thompson's Guidelines range was calculated identically to Pearse's, except that, because Thompson was convicted after trial, his offense level was five levels higher as a result of a two-level enhancement for a Section 1956 conviction and the lack of the three-level reduction for acceptance of responsibility.

full scope of the Tatto auto-subscription scheme,[8] (b) did not employ subordinates in the scheme as Pearse did with Liu, and (c) received payments representing a tiny fraction (approximately 3.5%) of the more than $10 million in criminal proceeds that Pearse received through the scheme. Goff's conduct was criminal, but, put simply, Goff's role was simpler, shorter, more replaceable and therefore much less central to the scheme's success than Pearse's role—a difference starkly reflected in the fact that Pearse earned nearly *29 times* more for his participation in the scheme than Goff did.[9]

Kevin Liu:  Liu worked under Pearse at Bullroarer as a computer programmer. While Liu participated in the fraud scheme, it is clear that he did so only at Pearse's direction. Liu exercised no authority over the scheme, and, apart from his modest salary at Bullroarer (about $44,000 per year), received no personal gain at all for his role in the scheme. By contrast, as Bullroarer's CEO and Miao's close associate, Pearse had a significant role in the scheme and personally pocketed more than $10 million in criminal proceeds. Pearse also engaged in various sophisticated tactics to conceal his role in the crime, including opening accounts in the names of nominee companies in various jurisdictions and issuing fake invoices to Tatto to cover up the criminal nature of the millions of dollars in payments that he was receiving. In sum, the Government respectfully submits that the sentence that the Court imposes on Pearse should reflect that Pearse was much more culpable than Liu, directed Liu as part of the criminal scheme, and received millions in fraud proceeds for his significant and extensive role in the scheme. The defendant's requested sentence of time served—which would amount to a sentence just two months longer than Liu's sentence—would not serve the ends of justice.

Francis Assifuah:  Assifuah operated a content provider called Bleam Technology ("Bleam"). At the suggestion of Eromo, Assifuah opened Bleam in February 2012 and used it to actively auto-subscribe consumers for less than one month. In total, Assifuah received over $600,000 in gross payments from Mobile Messenger, a significant portion (but not all) of which came from auto-subscribing proceeds and a portion (approximately 25%) of which Assifuah transferred to other co-conspirators. Ultimately, Assifuah was ordered to personally forfeit $346,717.08. Assifuah, who was sentenced to 36 months in jail, was far less culpable than the defendant in many ways, including that Assifuah participated in the scheme for less than one month (whereas the defendant participated for about two years) and received substantially less in criminal proceeds.

Jason Lee:  Lee worked as the Chief Technology Officer of Tatto. Miao tasked Lee with verifying that the phone numbers that Tatto received from the Mobile Messenger co-conspirators

---

[8] Miao explained to Goff that he (Goff) would be paid 10% of the proceeds of the numbers he provided, making it foreseeable to Goff that the loss was more than $3.5 million, but there is no evidence that Goff was aware of the true massive nature of the scheme. Miao sent e-mails to Pearse and Bachman to summarize their weekly earnings, but Goff was not copied on such e-mails.

[9] Indeed, of all the defendants in this case, Pearse received the third highest amount in criminal proceeds, behind only Miao, who is a cooperator yet to be sentenced, and Eugeni Tsvetnenko, a defendant who is yet to be extradited from Australia. Of the defendants sentenced to date, Pearse's personal cut of criminal proceeds—approximately $10.1 million—is the largest by far, as reflected in the above chart.

were valid and active, and to sort and filter the numbers to make it easier to run them through the Auto-Subscription Platform. After Lee performed these functions, Miao sent the numbers to Pearse and Liu to be run through the Auto-Subscription Platform. Lee, who pleaded guilty to a misdemeanor offense, was the least culpable defendant in this case and played a much smaller and more ministerial role than the rest of the co-conspirators. Lee was also compensated much more moderately than almost all other participants in the scheme, receiving a total of approximately $108,000 for his role.

**C.     Conclusion**

In sum, Pearse played a critical role in a years-long, massive consumer fraud scheme that victimized hundreds of thousands of victims and netted profits in the tens of millions, including more than $10 million for Pearse himself. The Government respectfully submits that the defendant's brazen, egregious, and long-running fraud warrants a sentence within the Guidelines range of 97 to 121 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:

Olga I. Zverovich
Jilan J. Kamal
Assistant United States Attorneys
(212) 637-2514/2192

cc:     Daniel Lynch, Esq.